**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:02-cr-93 |
| | ) | |
| OMARI PATTON, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM ORDER</u>**

Defendant Omari Patton is serving a sentence of 294 months' imprisonment after a jury found him guilty of conspiring to distribute and possess with intent to distribute controlled substances, including heroin, cocaine, and cocaine base, and using a communications facility to further a narcotics conspiracy. ECF 577; ECF 706. This Court originally sentenced Mr. Patton to a total term 360 months' imprisonment to be followed by five years of supervised release. ECF 706. However, Mr. Patton's term of imprisonment was later reduced under 18 U.S.C. § 3582(c)(2). ECF 1154. His anticipated release date from Bureau of Prisons custody is June 6, 2023.

Having completed more than twenty years of his sentence, Mr. Patton now moves for a reduction of his term of imprisonment to home confinement, under 18 U.S.C. § 3582(c)(1)(A), based on his underlying health conditions. ECF 1338. Mr. Patton recently suffered a heart attack and was diagnosed with a congenital heart defect. *Id.* at ¶¶ 9-10. He underwent heart surgery to correct that defect, from which he is still recovering. *Id.* 12. Mr. Patton also suffers from blood clotting and takes medication to manage it.

After carefully reviewing the record, the Court concludes that Mr. Patton has made the necessary showing of extraordinary and compelling reasons for this Court to reduce his sentence, and that the sentencing factors of 18 U.S.C. § 3553(a) support such a reduction. Thus, the Court grants his motion.

- 1 -

## **LEGAL STANDARD**

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). "One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582." *United States v. Mathis*, No. 10-19, 2022 WL 17592066, at *2 (W.D. Pa. Dec. 13, 2022) (Hornak, C.J.). That statute allows a court to reduce a defendant's term of imprisonment if it finds that (1) "extraordinary and compelling reasons" warrant the sentence reduction, (2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission," and (3) consideration of the ordinary sentencing factors under 18 U.S.C. § 3553(a) favors reduction. 18 U.S.C. § 3582(c)(1)(A)(i). A prisoner can file a compassionate-release motion *pro se* only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).

## **DISCUSSION & ANALYSIS**

### I.    **The Court may consider Mr. Patton's motion.**

As the government concedes, the administrative exhaustion requirement does not apply to Mr. Patton. ECF 1345, p. 7. That's because Mr. Patton is currently incarcerated at NEOCC on a detainer and cannot access BOP administrative remedies. *Id.* "[A] defendant that is not [in] BOP custody is not required to file an administrative request for release with the BOP." *United States v. Bilicic*, No. 14-121, 2021 WL 804322 *3 (W.D. Pa. Mar. 3, 2021) (Hornak, J.) (collecting cases).[1] Therefore, the Court will consider the merits of Mr. Patton's motion.

[1] NEOCC apparently agrees. Mr. Patton submitted an inmate grievance form to NEOCC on September 13, 2022, requesting compassionate release. ECF 1338-3. The facility responded to Mr. Patton on September 19, 2022, noting that it was merely a holding facility and not an authority over detainments or releases. *Id.*

## II.    There are extraordinary and compelling reasons to reduce Mr. Patton's sentence.

In considering Mr. Patton's motion, the Court must first determine whether Mr. Patton's medical conditions qualify as an "extraordinary and compelling" justification for his early release. As this Court has explained, the text of the statute "does not define—or place any limits on—what extraordinary and compelling reasons might warrant a reduction." *United States v. Somerville*, 463 F. Supp. 3d 585, 596 (W.D. Pa. 2020) (Ranjan, J.) (cleaned up). Giving that phrase its ordinary meaning, the Court has concluded that "§ 3582(c)(1)(A)(i) requires a justification for release that is both ***unusual*** (*i.e.*, unique to the inmate, and beyond the ordinary hardship of prison) and ***significant*** (*i.e.*, serious enough to make release appropriate)." *Id.* (emphasis in original). Mr. Patton's health conditions satisfy both prongs.

Mr. Patton recently suffered a heart attack. ECF 1338, ¶¶ 8-9. Upon receiving treatment for that serious event, Mr. Patton was diagnosed with a secundum type atrial defect. *Id.* at ¶ 10; ECF 1338-2. This defect is defined as a hole in the heart between the upper chambers (the atria). MAYO CLINIC, ATRIAL SEPTUM DEFECT (ASD), SYMPTOMS & CAUSES, https://www.mayoclinic.org/diseases-conditions/atrial-septal-defect/symptoms-causes/syc-20369715 (last visited Jan. 10, 2023). The hole increases the amount of blood that flows through the lungs. *Id.* It can cause a host of complications, including heart failure, stroke, early death, and high blood pressure in the lung arteries. *Id.*

Mr. Patton had surgery to close this hole, and he's still trying to recover from that surgery. The Mayo Clinic advises that "anyone who has had surgery for atrial septal defect needs regular echocardiograms and health checkups to watch for possible complications, such as irregular heartbeats (arrhythmias), heart valve problems, high blood pressure in the lung arteries (pulmonary hypertension) and heart failure." MAYO CLINIC, ATRIAL SEPTUM DEFECT (ASD), DIAGNOSIS & TREATMENT,

https://www.mayoclinic.org/diseases-conditions/atrial-septal-defect/diagnosis-treatment/drc-20369720 (last visited on Jan. 10, 2023).

On top of that, Mr. Patton has sought and received treatment for a blood clotting condition. ECF 1347, p. 2. He takes a prescription medication, Eliquis, for that one. ECF 1342. He reports that he regularly feels pain in his sternum that feels like "grinding." ECF 1347, p. 2. When he's reported this feeling to prison officials, he's been taken to medical for observation but hasn't received any real treatment. ECF 1342.

Importantly, this combination of conditions has led his cardiologist's office at the Cardiovascular Institute at Allegheny General to conclude that he needs to have "routine visits" to the "proper physicians" so that he can receive appropriate "heart and anticoagulation therapy." *Id.* It appears from the record before the Court, that Mr. Patton has not, to date, had those visits. According to the complete BOP medical record that the government submitted as an exhibit to its response, Mr. Patton has not been seen by a physician since May 2022, which was over seven months ago. ECF 1346.

The severity of Mr. Patton's health issues is unusual. They are unique to him and extend beyond any hardships an inmate could reasonably expect during his or her incarceration. They are also significant, as detailed above. The government's efforts to minimize Mr. Patton's heart condition by arguing that the surgery "repaired" it are unconvincing. Obviously, complications can arise after a major surgical procedure. And the Court has serious concerns that Mr. Patton has not received appropriate post-op treatment. The seven-month gap in visits to any physician, let alone a cardiology specialist, deviates from the treatment course recommended by the Cardiovascular Institute.

Adding to the Court's concerns are the potential complications that could arise

if Mr. Patton contracts COVID-19 again.[2]  Although, as the government points out, the CDC does not specifically list his heart conditions among those that "can make you more likely to get very sick from COVID-19," it does state that having "heart conditions" presents a greater risk.  Plus, a large new study on the aftereffects of a SARS-CoV-2 infection has revealed that people who have contracted COVID-19 had a higher risk of dangerous blood clots.  Rochelle Knight, et al., *Association of COVID-19 With Major Arterial and Venous Thrombotic Diseases: A Population-Wide Cohort Study of 48 Million Adults in England and Wales*, 146 CIRCULATION 892 (2022).  This revelation makes Mr. Patton's history of blood clotting particularly precarious in the current health environment.  While the Court acknowledges that there is presently a low percentage of positive tests at NEOCC, the combination of the fact that Mr. Patton recently suffered a heart attack, hasn't had the recommended post-operative care, and has a blood-clotting condition makes the risk of contracting COVID-19 a serious concern.  In any event, the Court's concerns about COVID-19 are secondary— the primary issue here is ensuring that Mr. Patton receives proper treatment while he is recovering from his heart surgery.

## III.   The Section 3553(a) factors support a sentence reduction.

The Court's finding of "extraordinary and compelling reasons" does not "automatically justify a reduction" in Mr. Patton's sentence or compassionate release.  *Somerville*, 463 F. Supp. 3d at 600.  Rather, the Court must "weigh the extraordinary

---

[2] The government's claim that Mr. Patton's "refusal to be vaccinated [against COVID-19] is dispositive" is misplaced.  ECF 1345, p. 12., Mr. Patton's refusal to take the vaccine is not unreasonable given his current blood-clotting condition.  For example, there were early reports that certain vaccines resulted in fatal blood clotting for a small number of people.  THE BRITISH MEDICAL JOURNAL (BMJ), https://www.bmj.com /company/newsroom/new-study-updates-evidence-on-rare-blood-clotting-condition- after-covid-19-vaccination/ (last visited Jan. 10, 2023).  Given Mr. Patton's history of blood clotting, it is at least understandable that he might be reluctant to get vaccinated, and thus his refusal to get vaccinated isn't indicative of a failure to mitigate any risk of harm.

reasons against the ordinary sentencing factors under 18 U.S.C. § 3553(A) to the extent they are applicable." *Id.* (cleaned up). This balancing and the ultimate determination of "whether to reduce an eligible defendant's term of incarceration … after considering the § 3553(a) is committed to the discretion of the [district court]." *United States v. Jones*, No. 12-38, 2020 WL 3871084, at *4 (W.D. Pa. July 8, 2020) (Hornak, C.J.) (citing *United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020)).

Consideration of the Section 3553(a) factors, on balance, confirms the Court's decision to reduce Mr. Patton's sentence.

As for the "nature and circumstances of the offense," Mr. Patton's conviction was undoubtedly serious. His conviction arose from his involvement in a multi-year drug-trafficking conspiracy that involved substantial amounts of both heroin and crack cocaine. Mr. Patton was individually found responsible for 10 kilograms of heroin and 600 grams of crack cocaine—a large amount of both drugs. Making matters worse, during the investigation, law enforcement searched Mr. Patton's truck and found a firearm along with quantities of those drugs.

The Court has considered this seriousness as a factor weighing against any reduction in Mr. Patton's sentence. Nothing in this order is meant to minimize the severity of Mr. Patton's crime. It's just that the factors below weigh strongly in favor of reduction and ultimately tip the scales in Mr. Patton's favor:

- To date, Mr. Patton has served 247 months of his sentence; based on his projected release date of June 2023, that would amount to serving 98% of this sentence—247 of 252 months, to be exact. The Court has the "authority to consider the length of the defendant's original custodial sentence, including the portions served and remaining, when weighing the § 3553(a) factors." *United States v. Brown*, No. 12-224, 2022 WL 2603559, at *14 (W.D. Pa. July 8, 2022) (Hornak, C.J.) (citing *Pawlowski*, 967 F.3d at 330-31). That he has served so much time (over

twenty years) and has so little time until his release date favors a small reduction in his sentence. *United States v. Figueroa*, No. 07-6219, 2022 WL 167536, at *3 (W.D.N.Y. Jan. 19, 2022) (finding fact that defendant "has served a substantial portion of his 20-year sentence (approximately 85 percent with good-time credit applied)" weighed "strongly in favor of release").

- While the Court is modifying Mr. Patton's sentence, it will include as an additional condition of supervised release a period of six months of home confinement. He'll be on supervised release for five years. Thus, "[e]ven under this new sentence, Mr. [Patton] has a long way to go before he will be permitted to fully re-integrate into society, and he will be subject to this Court's supervision until that time." *Somerville*, 463 F. Supp. 3d at 605; *see also United States v. Richardson*, No. 20-276, 2022 WL 2541275, at *4 (N.D. Cal. July 7, 2022) (granting compassionate release because of various health conditions and noting that any concerns about safety of the community "can be addressed by imposing supervised release guidelines and location monitoring"). Further, such a sentence is consistent with the kinds of sentences available for Mr. Patton's offense under the Sentencing Guidelines. *See* U.S.S.G. § 5F1.2 ("[H]ome detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment.").

- Mr. Patton has also submitted a compelling release plan. He intends on residing with his aunt, Carolyn Shelton, in her two-bedroom home in Pittsburgh. ECF 1338, ¶ 29. It appears that Ms. Shelton can provide additional guidance and monitoring of Mr. Patton while he is on home confinement. She can also help him get the medical treatment he needs. *See Figueroa*, 2022 WL 167536, at *3 (noting that release plan "would

provide [defendant] access to needed medical care at nearby facilities"). Not only that, but this plan will also allow Mr. Patton to be closer to his father, Jeffrey Patton, who has agreed to help his son obtain a commercial driver's license and then employ him in his small business. *Id.* at ¶ 30. A concrete employment opportunity such as that will aid in Mr. Patton's rehabilitation.

The government points to other instances of alleged misconduct to argue that Mr. Patton has "a disregard for following rules and the law and show a high risk that he would again engage in dangerous behavior if released." ECF 1345, pp. 14-16. The Court does not see such a "high risk." While the Court agrees that Mr. Patton's criminal history is less than sterling, Mr. Patton's prior convictions all occurred more than twenty years ago. And the discipline that he's been given in prison has been spread out over a twenty-year period. So, while the raw number may seem large, put into the proper context, his record while serving his sentence is not as bad as the government makes it seem. Moreover, most of the discipline he received was for things that would not be an issue while on home confinement, such as possessing an unauthorized item, phone abuse, and other minor infractions of the facility's rules.[3]

In sum, the Court finds that the twenty years Mr. Patton has served in prison, plus the extra condition of home confinement while on supervised release, is a sentence that is sufficient but not greater than necessary to account for Mr. Patton's crimes. The Court's reduction in Mr. Patton's sentence is consistent with any applicable policy statements issued by the Sentencing Commission.

---

[3] Mr. Patton was acquitted by a jury at Case No. 2:19-cr-8, and therefore the Court will not hold anything that happened in that trial against him in deciding this motion. The Court acknowledges, as it must, that Mr. Patton was then indicted for related conduct in a new case at No. 2:21-cr-121. Those charges, however, remain pending, and Mr. Patton is entitled to a presumption of innocence and an opportunity to defend himself in that case.

* * *

For these reasons, this **10th day of January, 2023**, it is hereby **ORDERED** that Mr. Patton's motion (ECF 1338) is **GRANTED**.

Mr. Patton's remaining term of imprisonment is hereby extinguished as of this date, but the Court adds as a special condition of supervised release six months of home confinement with location monitoring.[4]   The Court also tentatively approves Mr. Patton's release plan, subject to further review and comment by the Probation Office.

This order shall not be construed to order Mr. Patton's immediate release from custody.   This is because Mr. Patton is being detained pending trial at Case No. 2:22-cr-121.   Mr. Patton must seek a modification of the detention order entered in that case in order to be released from custody.    This Court expresses no opinion on the appropriateness of such a modification.

BY THE COURT:

/s/ J. Nicholas Ranjan
United States District Judge

---

[4] "The defendant shall be placed on home detention for a period of 180 days, to commence as soon as arrangements can be made by the Probation Office. The defendant shall abide by all technology requirements. The location monitoring technology requirement, i.e., Radio Frequency (RF), Global Positioning System (GPS), or Voice Recognition, or Virtual Supervision Monitoring, is at the discretion of the probation officer. During the period of home detention, the defendant shall remain at their residence except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by the probation officer. During this time, the defendant shall comply with the rules of the location monitoring program and may be required to maintain a landline telephone, without special features, at the defendant's place of residence. The defendant shall pay all or part of the costs of participation in the location monitoring program as directed by the court and probation officer, but not to exceed the daily contractual rate."